IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2010

**STATE OF TENNESSEE v. ELGIE SYKES**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-07352     Lee V. Coffee, Judge**

---

**No. W2009-02296-CCA-R3-CD  - Filed July 14, 2011**

---

The Defendant-Appellant, Elgie Sykes, was convicted by a Shelby County jury of first degree premeditated murder and sentenced to life with the possibility of parole.  On appeal, Sykes claims:  (1) the jury instruction for premeditation was improper; (2) the insufficiency of the evidence; (3) the trial court erred by excluding the testimony of a psychologist; and (4) the trial court erred by failing to instruct the jury not to consume alcohol while sequestered.  Upon review, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Larry Copeland and Taylor Eskridge (at trial), Memphis, Tennessee; Paul K. Guibao, and Matthew S. Lyons (on appeal), Memphis, Tennessee, for the Defendant-Appellant, Elgie Sykes.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; Glen Baity and Kate Edmands, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Trial**.  This case involves a continuing conflict between the Defendant-Appellant, Elgie Sykes, and the victim, Jason Hopson.  In July of 2006, the victim shot and injured Sykes.  Some four or five months after the initial shooting, Sykes told the victim's sister, "You need to tell your mama and your aunt to get a black dress . . . because I'm going to kill your brother."  Almost a year later, on April 7, 2007, Sykes shot and killed the victim.  The

victim's girlfriend, Leykishia Aretha Anderson, and her mother, Aretha Williams, were both present when the victim was shot and killed. They identified Sykes as the shooter. Sykes confessed to shooting the victim; however, he claimed it was self-defense.

Leykishia Aretha Anderson, the victim's girlfriend, testified that the victim visited her apartment, which she shared with her mother, at approximately 1:00 a.m. on the morning of the offense. Anderson said she and Hopson stood outside of the apartment and talked for about ten minutes. While they were talking, Hopson abruptly grabbed Anderson and pulled her into a neighbor's apartment. Anderson turned around and observed Sykes holding a gun. She stated that Sykes "was right there in our face[.]" Sykes wore a black hooded sweatshirt, black jeans, and a "black, big bubble coat." Anderson was able to see Sykes's face because it was not covered. While inside the neighbor's apartment, Hopson grabbed Anderson and tried to use her as a shield. Sykes told Hopson to "'[l]et her go.'" Anderson testified that she made several attempts to get away from Hopson. Sykes shot his gun each time she was able to momentarily free herself. Ultimately, Anderson observed Sykes shoot Hopson several times with a small, black gun.

Prior to the night of the offense, Anderson encountered Sykes twice. The first encounter occurred about a month before the shooting. Anderson was at her apartment with Hopson. She noticed that Sykes was outside with a group of people. Anderson heard Sykes calling for Hopson to come outside and "scrap it out with him." According to Anderson, Sykes claimed there "was going to be consequences" if Hopson did not go outside. Hopson remained inside the apartment. Anderson testified that Sykes came to her apartment on a later date when Hopson was not present. Sykes informed Anderson of his past "disagreements" with Hopson, including the fact that Hopson had shot Sykes. Anderson said Sykes advised her to stay away from Hopson because Sykes was going to kill him. She explained:

> [Sykes] was just telling me . . . what had happened between him and [Hopson] and he . . . pulled up his shirt and he showed me his scars of what happened and he was telling me that he made his mama cry and how he almost died twice and whenever he seen him he was going to get him. He . . . didn't threaten me in any kind of way.

Asked whether Sykes actually used the term "kill," Anderson stated, "I know he told me he was going to get him. I'm assuming that meant kill him because that's what happened." Anderson did not contact the police after Sykes threatened to kill Hopson. She stated, "He didn't threaten me so I didn't feel a need to call them."

-2-

Following the victim's death, Anderson went to the police station and identified Sykes as the shooter from a photographic lineup. Anderson did not see Hopson with a gun that night or before he was killed. When asked whether a struggle occurred between Hopson and Sykes, Anderson responded, "No. They didn't touch each other at all." On cross-examination, Anderson testified that Hopson was shot inside the neighbor's apartment. She said it was right across the hall from her apartment. Anderson described the neighbor's apartment as being really dark. Anderson's mother came into the neighbor's apartment when the last shot was fired. Her mother told Sykes not to shoot again and Sykes walked out of the apartment. Anderson's mother then called 911.

Aretha Williams, Anderson's mother, had known Hopson for approximately two-and-a-half years, and they had a good relationship. Williams said Hopson came to the door of her apartment before 12:00 a.m. on April 7, 2007. Williams opened the door and hugged Hopson. She said Anderson went outside to speak with Hopson and she went back into her apartment. By the time she got to the middle of the floor, she heard a gunshot. Williams immediately ran outside, entered the neighbor's apartment, and observed Anderson, Hopson, and Sykes. She stated:

> [Hopson] was pulling my daughter in front of him and like every time she would jerk off from [him], [Sykes] would shoot and [Sykes] hollered, "Let her go. Let her go," and I said, "Don't shoot him no more." And I backed out the door. [Sykes] came to me, walked right here to the side of the stairwell, looked at me, and then proceeded to go down the stairs.

Williams observed Sykes fire two or three shots while she was in the neighbor's apartment. She testified that Sykes used a black gun and wore black pants and a black hooded sweatshirt. Williams said she immediately recognized Sykes. She was later taken to police headquarters and identified Sykes from a photographic lineup. Williams testified that she had no doubt that Sykes was the shooter.

Two weeks before the shooting, Williams met Sykes. He came to her apartment looking for Hopson. Williams recalled:

> [Sykes] came and he knocked on my door and he asked was [Hopson] there . . . and I said, "Yeah. He in there." Well, he said, "You tell him to come out here and fight me now. Won't nothing happen to him. It will just be squashed, but if he don't, I'm going to kill him."

Williams did not see Sykes again until the shooting.

Tori Davis testified that she dated Sykes for six years; however, they were not dating at the time of the offense. Sykes came to her apartment unannounced in the early morning hours of April 7, 2007. Davis's apartment was within walking distance of Anderson's apartment. Davis testified that Sykes was inside of her apartment for a brief period of time. He then went outside to smoke a cigarette. Davis said Sykes left the apartment after smoking the cigarette without saying where he was going. About ten minutes later, Davis heard gunshots.

Davis initially remained inside the apartment but went outside after the shooting stopped. Sykes approached her apartment by foot, and he told her to go inside. Davis and Sykes went into the apartment. Sykes wore dark blue pants, a blue shirt, and a black leather jacket. The State introduced a pair of blue pants, a blue shirt, and a black jacket as exhibits. Davis identified these items as the clothes worn by Sykes. Davis testified that Sykes took off these clothes when he entered her apartment. He placed them in a bag. Sykes stayed at her apartment for a brief period before leaving. Davis said the police showed up at her apartment sometime later. Davis testified that the police were given consent to search and found a gun in the apartment. On cross-examination, Davis testified that she was not aware of the past problems between Sykes and Hopson. She did know that Sykes had been shot.

Jean Dandridge, Sykes's girlfriend at the time of the offense, was at work when the shooting occurred. Her shift was from 10:30 p.m. to 6:30 a.m. Her son, Tracy Beavers, was at home during her shift. At around 1:00 to 1:30 a.m., Dandridge called home to check on Beavers. Beavers answered the phone and explained that Sykes was at the house. Dandridge testified that Sykes was asleep when she returned home from work at about 7:30 a.m. Later that morning, Sykes received a phone call from one of his friends. The friend said Hopson was killed. Dandridge asked Sykes if he knew what happened. He denied having any knowledge about the killing. Dandridge said later that evening, Sykes changed his story about the extent of his contact with Hopson. Sykes admitted to having an altercation with Hopson on the night of the offense and claimed that he tried to scare Hopson by shooting his gun up in the air. However, Sykes denied shooting Hopson and cried while describing the altercation. She acknowledged that Sykes previously talked about how he wanted to kill Hopson. Dandridge had seen Sykes with a silver gun in the past.

Dandridge testified that when she came home from work, she heard Sykes tell Beavers to get a garbage bag. Later, she noticed a leather jacket in the garbage bag. Dandridge had Beavers take the garbage bag to a dumpster. Dandridge said she asked Sykes about the garbage bag, and he told her that it contained "some clothes that he didn't need anymore." Dandridge testified that Sykes had a conversation with Beavers regarding Sykes's

whereabouts on April 7, 2007. She stated, "[Sykes] told my son Tracy that if anybody asked, that he was home at my house all night." Dandridge said Sykes claimed he left a weapon at the house of someone named DeShawn. Dandridge testified that Sykes was not a violent person.

Tracy Beavers, Dandridge's nineteen-year-old son, testified that he was at home with Sykes on the night of the offense. He said Sykes left the apartment at around midnight without saying where he was going. Sykes wore a black hooded sweatshirt, black pants, and a black jacket. Beavers did not see Sykes in possession of a weapon. He had seen a gun in the trunk of his mother's car about two or three weeks before the shooting. Beavers testified that on the morning after the shooting, Sykes told him to grab a black trash bag. Sykes later gave him a trash bag with something in it, but Beavers did not look to see what was inside. He said Sykes told him to get rid of the trash bag. Beavers ultimately rode with Dandridge and Sykes to a dumpster where they dropped off the trash bag. Beavers said Sykes repeatedly told him to remember everything that happened on the night before because it was important. Sykes did not give specific instructions on what to say. Beavers was asked about the statement he gave to the police. In the statement, he described Sykes's gun as silver with a brown handle.

Sergeant Kevin Lundy of the Memphis Police Department testified that he was the case coordinator for the murder investigation. On the morning after the shooting, Sergeant Lundy went to Davis's apartment. Davis initially denied having seen Sykes for a week. She eventually acknowledged that Sykes came to her apartment on the night of the shooting and changed clothes. Sergeant Lundy obtained consent to search the apartment and found a revolver. The revolver contained one live round and four spent shell casings. During the investigation, Sergeant Lundy also met Dandridge and Beavers. They directed Sergeant Lundy to a dumpster where Dandridge had thrown a black plastic bag. Sergeant Lundy said the bag contained a black leather jacket and a black hooded sweatshirt.

On cross-examination, the defense questioned Sergeant Lundy about an incident report prepared by one of the first responding officers. The report contains Williams's description of the perpetrator. Williams described the perpetrator as "an unknown black man wearing a dark hooded jacket, dark pants, armed with a black handgun." Sergeant Lundy said the report indicates that the first responding officer also spoke with Anderson. Anderson reportedly stated that "she was inside [the neighbor's apartment]. She heard shots then opened the door. The victim Hopson fell to the floor in the doorway." Sergeant Lundy was asked about an affidavit of complaint that he signed. He read the following passage from the affidavit: "After further investigation defendant gave a statement of admission, that led to the recovering of the weapon and the clothes that were worn during the shooting." Sergeant Lundy testified that he did not test Anderson's clothes for residue.

-5-

Agent Steve Scott of the Tennessee Bureau of Investigation (TBI) testified that he was assigned to the firearms identification unit. He examined the revolver and cartridge cases found at Davis's apartment. Agent Scott also examined a bullet recovered from the apartment where Hopson was killed and three bullets recovered from Hopson. Agent Scott testified that the four cartridge cases could have been fired from the revolver. He stated, however, that this finding was not conclusive. Agent Scott testified that the bullet recovered at the crime scene was fired from the revolver. He said the three bullets recovered from the victim's body were also fired from the revolver.

Dr. Miguel Laboy, an assistant medical examiner for Shelby County, performed the autopsy of Hopson. Dr. Laboy said the autopsy revealed one gunshot wound to the chest, one gunshot wound to the abdomen, three gunshot wounds to the back, and one gunshot wound to the right arm. Dr. Laboy examined the clothing worn by Hopson. He saw no powder residue on the clothing or powder stippling on the body. Dr. Laboy said residue or stippling would have indicated that the gunshots were fired from close range. On cross-examination, Dr. Laboy acknowledged that he did not run any tests on Hopson's clothes.

The defense proof began with Michael Spencer, the communications supervisor for the Memphis Police Department. Spencer was responsible for the 911 recordings for the City of Memphis. The 911 call from Anderson's apartment was introduced as an exhibit and played for the jury. During the call, Williams repeatedly stated that she did not know the identity of the shooter.

Officer Samuel McMine of the Memphis Police Department testified that he responded to the scene of the offense and spoke to Anderson for the purpose of getting a description of the suspect. Officer McMine said Anderson described the perpetrator as "an unknown male wearing dark clothing." Anderson also reported that the perpetrator had a black gun.

Sykes testified that he was at Dandridge's home on the evening of April 6, 2007. Dandridge was at work, and he was watching her children. Sykes said he put the children to bed at about 11:30 p.m. and left Dandridge's home after receiving a phone call from an associate. The associate lived in the same apartment building as Anderson. Sykes began walking towards the meeting point at about 12:30 or 12:45 a.m. Sykes testified that he was walking across the street when he noticed a vehicle coming directly towards him which forced him to go back to the street curb. He decided to stop at Davis's apartment, which was "directly next door" to the associate's apartment building. Sykes was at Davis's apartment for a brief period of time. He left the apartment and walked towards the associate's apartment building.

Upon arrival, Sykes noticed the vehicle that previously ran him off the street. He thought it belonged to his associate and started walking towards the associate's apartment. He asked an individual standing inside of an open apartment if he knew who owned the vehicle in the parking lot. Sykes did not hear a response, so he kept walking. He then heard a familiar voice, turned, and saw Hopson standing at the threshold of the door. Sykes said Hopson lifted up his shirt and reached for his waist. Sykes grabbed Hopson, and they started wrestling. Sykes testified that Hopson's gun fell to the ground. At that time, Sykes reached for his own gun and shot Hopson. Sykes fired three or four shots, hitting Hopson twice. Sykes testified that he then left the apartment building and went back to Davis's apartment. He took off his clothes and placed them in a bag. Sykes said he also put the gun in the bag. Sykes left Davis's apartment and called Dandridge. He told Dandridge what happened, and she told him to go to her house. Sykes said he did not mean to harm Hopson.

Sykes testified that he went to the police department at about 11:00 a.m. on the morning after the shooting to determine if there was a warrant for his arrest. Sykes testified that he admitted to an officer that he shot somebody the previous night. Sykes claimed he was told to go home and wait for the police to contact him. Sykes returned to Dandridge's home and received a phone call from the police at about 1:30 p.m. Sykes went back to the police department and was questioned by the police. He said he gave two statements. Sykes claimed the first statement was truthful and that he changed his version of the facts in the second statement because the police threatened to "lock up" Dandridge and Davis.

Sykes admitted that he threw his clothes in a dumpster after the shooting. He testified that Anderson was not present when he shot Hopson and denied telling anyone that he was going to kill Hopson. He claimed he moved to Frayser after he was shot by Hopson because he thought Hopson was going to kill him. He stated that Hopson would drive past his house and point his gun out of his car window. In talking with the police, Sykes said he tried to create an alibi defense because he was scared.

On cross-examination, Sykes admitted that he purchased a gun after he was shot by Hopson. Sykes conceded that he was armed when he encountered Hopson at the apartment building and that he left his gun at Davis's apartment. Sykes testified that he shot Hopson four times and denied trying to use Beavers as an alibi. Sykes said he wore a black leather jacket and blue pants on the night of the offense. He claimed no one else was present when he shot Hopson. Sykes stated, however, that he saw Anderson before the shooting began and that Anderson was standing near the door of the neighbor's apartment.

Following the proof at trial, the jury convicted Sykes of first degree premeditated murder. He filed a motion for new trial, which was denied. Sykes then filed a timely notice of appeal.

-7-

**ANALYSIS**

**I. Instruction for Premeditation.** Sykes raises two arguments based on the special jury instruction that listed factors indicative of premeditation. First, Sykes claims the presence of these factors unduly suggested that the murder was premeditated. He asserts:

> [T]he charge incorporated facts that had been unquestionably testified to: procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the secretion of evidence, and calmness after the killing. The charge essentially instructed the jury concerning the factual conclusion–the existence of premeditation–to be drawn from that evidence.

Second, Sykes challenges the legal accuracy of the instruction. He claims the instruction needed to expound upon the application of several factors. In response, the State concedes that the instruction was improper and relies upon State v. Brandon Compton, a prior decision from this court holding that a similar instruction was erroneous. See State v. Brandon Compton, No. E2005-01419-CCA-R3CD, 2006 WL 2924992, at *6-7 (Tenn. Crim. App., at Knoxville, Oct. 13, 2006). The State argues, however, that the error was harmless because the record contains overwhelming evidence of premeditation. Because we conclude that the erroneous special instruction for premeditation was not harmless beyond a reasonable doubt, we reverse the judgment of the trial court and remand for a new trial.

A defendant has a "'constitutional right to a correct and complete charge of the law.'" State v. Litton, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

The trial court gave the following instruction for premeditation:

> A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed

-8-

prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

The Court further charges you that the elements of premeditation may be inferred from the circumstances of the killing. The element of premeditation is a factual question to be determined by the jury from all the circumstances surrounding the killing. Several circumstances may be indicative of premeditation, including, but not limited to: declarations by the defendant of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence of the killing and calmness immediately after the killing. A jury is not limited to any specific evidence in finding or inferring premeditation, but it may be established by any evidence from which a rational jury may infer that the killing occurred after the exercise of reflection and judgment. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the jury may infer premeditation.

As an initial matter, we agree with the parties that the instruction in this case was improper; thus, our analysis of this issue will be limited to whether Sykes is entitled to relief based on the erroneous jury instruction. Brandon Compton, 2006 WL 2924992, at *6 (addressing similar instruction and concluding it was incomplete statement of the law and tantamount to commenting on the evidence); State v. Chuncy Lesolue Hollis, No. W2009-02302-CCA-R3-CD, 2011 WL 303240, at *6 (Tenn. Crim. App., at Jackson, Jan. 25, 2011) (concluding the same); But see State v. Lakeith Humphrey, No. W2009-01367-CCA-R3-CD, 2011 WL 890940, at *5 (Tenn. Crim. App., at Jackson, Mar. 15, 2011) (analyzing similar instruction and concluding the instruction was not improper comment on the evidence) application for perm. to appeal filed (Tenn. May 16, 2011).

In Chuncy Lesolue Hollis, this Court concluded that instructional errors which misstate the element of premeditation fall "within the category of a harmless, non-structural,

non-constitutional error[.]" 2011 WL 303240, at *7 (citing State v. Paul Wallace Dinwiddie, Jr., No. E2009-01752-CCA-R3-CD, 2010 WL 2889098, at *10 (Tenn. Crim. App. July 23, 2010) (internal citations omitted), perm. to appeal dismissed (Tenn. Oct. 15, 2010). In such a case, a reviewing court's "'inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to error.'" Id. at *11 (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993)). Under this harmless error analysis, "[t]he existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Id.; see also State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (citing State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002); State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006); State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)). In other words, the test is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Allen, 69 S.W.3d at 190 (quoting Neder v. United States, 527 U.S. 1, 15 (1999)); see also Rodriguez, 254 S.W.3d at 371.

Upon our review, we cannot conclude that the guilty verdict in this case "'was surely unattributable'" to the erroneous special instruction on premeditation. Paul Wallace Dinwiddie, Jr., 2010 WL 2889098, at *11 (quoting Sullivan, 508 U.S. at 279); see also Chuncy Lesolue Hollis, 2011 WL 303240, at *7. In this case, Sykes admission to shooting the victim and his claim of self-defense heightened the importance of the jury receiving a proper instruction on premeditation. Accordingly, we reverse the judgment of the trial court and remand for a new trial. Although our holding renders an analysis of Sykes's sufficiency of the evidence claim moot, we will address this issue in the event of further appellate review.

**II. Sufficiency of the Evidence**. Sykes claims the evidence did not support his conviction for first degree premeditated murder. He argues that the State failed to prove he acted with premeditation. In response, the State contends a rational juror could have found the elements of the offense beyond a reasonable doubt. It claims the evidence showed that the murder was premeditated. The State refers to the testimony of Anderson and Williams about what transpired during the shooting. It also points to the actions of Sykes before and after the murder. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Bland, 958 S.W.2d at 659. When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule

13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). Recently, the Tennessee Supreme Court adopted the United States Supreme Court standard that direct and circumstantial evidence should be treated the same when reviewing the sufficiency of the evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

According to Tennessee Code Annotated section 39-13-202(a)(1), first degree murder includes the "premeditated and intentional killing of another." Premeditation is defined, under subsection (d), as follows:

As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d) (2007). A person's actions are "intentional" if it is the person's "conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18) (2007).

The Tennessee Supreme Court has stated that "premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). The Court identified the following factors as supporting a finding of premeditation:

> The use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

Id. (citing Bland, 958 S.W.2d at 660). These factors, however, are not exhaustive. Id. The trier of fact may also consider evidence of the defendant's motive and the nature of the killing. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

In this case, the record contains sufficient evidence of premeditation. Our analysis must start with Anderson's account of the murder. She testified that on the night of the shooting, she was talking with Hopson outside of her apartment. Hopson abruptly pulled her inside of the neighbor's apartment. When Anderson turned around, Sykes was standing a few feet away from her. She said Sykes appeared out of nowhere. Anderson testified that Sykes was holding a gun. She said Hopson grabbed her and tried to use her body as a shield. Anderson recalled that Sykes told Hopson to "'[l]et her go.'" She testified that Sykes shot Hopson each time she was able to momentarily free herself. Anderson said there was not a struggle between Sykes and Hopson. She testified that Sykes left the neighbor's apartment after the shooting. Her account of the murder was generally corroborated by the testimony of her mother, Williams. Williams claimed she entered the neighbor's apartment after the first shot was fired.

Several of the factors set forth in Davidson support a finding of premeditation. According to Anderson and Williams, Hopson was not armed at the time of the shooting. Several witnesses testified that Sykes made declarations of his intent to kill Hopson in the weeks before the shooting. Jones, Anderson, and Williams testified in detail about separate incidents in which Sykes claimed he was going to kill Hopson. For example, Anderson said Sykes came to her apartment and explained why he was upset with Hopson. She said Sykes warned her to stay away from Hopson because Sykes "was going to get him." Sykes certainly had a motive to kill Hopson. Hopson purportedly shot Sykes in July of 2006. Sykes said Hopson continued to threaten his life even after the shooting. Sykes acknowledged that he purchased a gun after he was shot by Hopson. He said he was carrying the gun when he went to the apartment building. The evidence showed that Sykes tried to conceal the murder.

-12-

Sykes acknowledged that he went to Davis's apartment immediately after the shooting and changed clothes. He said he placed the clothes in a garbage bag and took the garbage bag to a dumpster. Davis testified that the police found a gun at her apartment. This gun was conclusively linked to the shooting by the firearms expert. Testimony was also presented that Sykes tried to use Beavers as an alibi. The medical examiner testified that Hopson had multiple gunshot wounds.

We recognize that Sykes claimed he shot Hopson in self-defense. Through the guilty verdict, the jury clearly discredited Sykes's account of the shooting. This court is not permitted to override the jury's credibility determinations. See Odom, 928 S.W.2d at 23. The foregoing evidence was sufficient to establish that Sykes acted with premeditation. Upon review, a rational jury could have found the essential elements of first degree murder beyond a reasonable doubt. Sykes is not entitled to relief on this issue.

**III. <u>Admissibility of Expert Testimony</u>**. Sykes claims the trial court erred by not allowing Dr. F.A. Steinberg to testify about Sykes's mental condition. Dr. Steinberg performed a mental evaluation of Sykes and chronicled his findings in a report. Sykes argues that Dr. Steinberg should have been permitted to explain his findings to the jury. He concedes that Dr. Steinberg did not find that he lacked the mental capacity to commit premeditated murder. Nonetheless, Sykes asserts:

> [T]he proposed evidence was intended to show that . . . based upon the specific mental disposition of Appellant, the Appellant may have mis-perceived a threat that did not in fact exist or acted under an honest belief that he was defending himself. This is a specific question of fact that should have been presented to the jury for their consideration and would have been extremely useful and relevant to the question of premeditation and intent.

In response, the State claims this issue is waived because no offer of proof was made. The State also argues that the trial court did not abuse its discretion by disallowing the testimony. It contends Dr. Steinberg's testimony was inadmissible because the results of the evaluation showed that Sykes had the mental capacity to commit premeditated murder.

We are precluded from reviewing this issue because it was not properly raised before the trial court. In examining the record, the defense first mentioned the possibility of a "doctor's" testimony after the State rested. The defense made the following statement to the trial court:

> I have recontacted my doctor again, Judge, and unfortunately, for the record, my doctor is not going to be able to meet the standards put forth by [State v.

*Ferrell*, 277 S.W.3d 372 (Tenn. 2009)], as we discussed the case. There was something in that report I looked at that I thought gave that to me, but after a discussion with him–

The trial court interjected that it had read <u>Ferrell</u>. It stated that the expert would not be permitted to testify unless he or she met the standards set forth in <u>Ferrell</u> and <u>State v. Hall</u>, 958 S.W.2d 679 (Tenn. 1997). The defense made no additional statements to the trial court about the admissibility of Dr. Steinberg's testimony.

Based on the transcript, we cannot say that the trial court made a ruling on this issue. Defense counsel conceded that the testimony was inadmissible. Furthermore, Dr. Steinberg was never mentioned by name, and the substance of his purported testimony was not presented through the required offer of proof. <u>See</u> Tenn. R. Evid. 103(a)(2); <u>Hall</u>,958 S.W.2d at 691 n.10 (stating that appellate review is generally precluded if an offer of proof is not made). In viewing the trial court's findings at the motion for new trial hearing, the trial court may have examined two documents from Dr. Steinberg: a letter from Dr. Steinberg to defense counsel and a medical evaluation performed by Dr. Steinberg.[1] However, based on the trial transcript, neither document was entered as an exhibit or considered by the trial court at the time of trial. We see no evidence that the trial court made a ruling on this issue. The trial court simply informed defense counsel that an expert witness would have to meet the admissibility requirements of <u>Ferrell</u> and <u>Hall</u>. This issue is waived because it was not properly raised before the trial court. <u>See</u> T.R.A.P. 3, Adv. Comm'n Cmt., subdiv. (e) ("Failure to present an issue to the trial court . . . will typically not merit appellate relief."). Sykes is not entitled to relief.

**IV. <u>Instruction for Alcohol Consumption</u>**. Sykes argues that the trial court should have instructed the jury not to drink alcohol while sequestered. Defense counsel claims he observed "that members of the jury were intoxicated or suffering from the effects of recent alcohol consumption just prior to deliberations[.]" The State contends this issue is waived because Sykes failed to cite to legal authority in support of his claim. Additionally, the State asserts that the record contains no proof, other than defense counsel's own observations, that the jurors were under the influence of alcohol.

We agree with the State that this issue is waived. Sykes raised this issue for the first time in his motion for new trial. In the motion, defense counsel claims he observed jurors under the influence of alcohol just before deliberations began. Defense counsel did not inform the trial court of his observations at that time. Under the Tennessee Rules of

---

[1]The letter is included in the record. It was not designated as an exhibit at trial or mentioned in the transcript. The medical evaluation was made an exhibit, albeit at the motion for new trial hearing.

Appellate Procedure, defense counsel was required to take "whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). Here, the harmful effect of the alleged error could have been prevented if defense counsel simply brought the issue to the trial court's attention before the deliberations began. Defense counsel's inaction deprived the trial court of the opportunity to determine whether the jurors were under the influence of alcohol. This issue is waived based on the defense's failure to comply with Rule 36(a). Cf. State v. Tune, 872 S.W.2d 922, 930 (Tenn. Crim. App. 1993) ("A party cannot witness misconduct on the part of the court, await the result of the verdict, and then, if it is against him or her, object to the alleged misconduct."). The issue is also waived because it was raised for the first time in the motion for new trial. Rule 30(b) of the Tennessee Rules of Criminal Procedure permits a defendant, under certain circumstances, to challenge a jury instruction for the first time in a motion for new trial. This rule, however, only extends to erroneous jury instructions and situations in which a trial court failed to give a requested instruction. See State v. Haynes, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986). The court in Haynes made clear that "alleged omissions in the charge must be called to the trial judge's attention at trial or be regarded as waived." Id. (citing Rule v. Empire Gas Corp., 563 S.W.2d 551, 554 (Tenn. 1978)).

Because of the waiver, we are left to review this issue under a plain error analysis. See T.R.A.P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). In State v. Adkisson, this court stated that in order for an error to be considered plain:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (citations omitted). All five factors must be shown, and it is not necessary to consider every factor if it is obvious that one of the factors cannot be established. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000). Here, the record contains no evidence regarding the jurors' sobriety at trial. Therefore, we cannot conclude that a clear and unequivocal rule of law was breached. We note the trial court did address this issue at the motion for new trial hearing. Based on its own observations at trial, it saw no support for the claim that the jurors were intoxicated or impaired. We hold that the alleged misconduct did not amount to plain error. Accordingly, Sykes is not entitled to relief on this issue.

## CONCLUSION

Upon review, the judgment of the trial court is reversed and remanded for a new trial.

_____
CAMILLE R. McMULLEN, JUDGE